UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
EDWARD FRANCIS LUPO,

                          Plaintiff,

           -against-

ANDREW SAUL,[1]
Commissioner of Social Security,

                        Defendant.
-------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**
17-CV-1722 (JMA)

FILED
CLERK
11/23/2020 10:09 am
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**APPEARANCES**

Hannalore Merritt
Osterhout Berger Disability Law
521 Cedar Way
Suite 200
Oakmont, PA 15139
    *Attorney for Plaintiff*

Mary M. Dickman
United States Attorney's Office, EDNY
610 Federal Plaza
Central Islip, NY 11722
    *Attorney for Defendant*

**AZRACK, United States District Judge:**

    Plaintiff Edward Francis Lupo ("Plaintiff") seeks review of the final determination by the Commissioner of Social Security (the "Commissioner"), reached after a hearing before an administrative law judge ("ALJ"), denying Plaintiff disability insurance benefits under the Social Security Act.  The case is before the Court on the parties' cross-motions for judgment on the pleadings.  For the reasons discussed herein, Plaintiff's motion for judgment on the pleadings is DENIED, the Commissioner's cross-motion is GRANTED.

---

[1] Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

# I.  BACKGROUND

## A.  Procedural History

Plaintiff filed for disability insurance benefits with the Social Security Administration ("SSA") on March 4, 2014 based on allegations of neuropathy in his lower extremities and Asperger's Disorder.  (Tr. 155-63.)  Following denial of his claim, Plaintiff appeared with his attorney at a hearing before Administrative Law Judge Patrick J. Kilgannon ("ALJ Kilgannon" or the "ALJ") on May 5, 2016.  (Tr. 14-38.)

In a decision dated July 27, 2016, the ALJ denied Plaintiff's claims, finding that he was not disabled from his alleged onset date of August 15, 2013 through December 31, 2018, the date he was last insured.  (Tr. 57.)  The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform medium work except that "he can only occasionally climb ladders, ropes and scaffolds"; "can frequently climb ramps or stairs"; and "can frequently balance, stoop, kneel, couch and crawl."  (Tr. 58.)  In addition, the ALJ found that Plaintiff needs to avoid concentrated exposure to excessive noise and is limited to "low stress work" and "only occasional interaction with public and coworkers."  (Id.)  The ALJ determined that though these limitations would preclude performance of Plaintiff's previous employment, there are jobs that exist in significant numbers in the national economy that he can perform.  (Tr. 63-64.)  ALJ Kilgannon's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on January 27, 2017.  (Tr. 1-2.)  This appeal followed.

## B.  Plaintiff's Background and Testimony

Plaintiff was born on May 19, 1954.  Plaintiff has a bachelor's degree in business and a Master of Business Administration.  (Tr. 19-20, 145.)  Plaintiff worked as a quality consultant

from 2010 until August 15, 2013, when he was laid off.  (Tr. 20-21, 158-59, 176.)  Prior to that, he worked as a quality engineer and a quality assurance engineering supervisor.  (Tr. 159, 176.)

As part of his application for disability insurance benefits, Plaintiff filled out a function report, dated May 27, 2014.  (Tr. 164-75.)  Plaintiff stated that he was "born with Asperger's Disorder, a condition recently diagnosed," and in October 2013, "developed a severe condition with walking, stability, and neuropathy."  (Tr. 165-66.)  Plaintiff stated that while standing he sometimes felt unstable and needed to hold onto something.  (Tr. 169.)  Sitting was "[n]ot a problem for short durations," but his legs started to cramp if he sat for longer periods.  (Tr. 170.)  He reported that he could walk only short distances, because his legs sometimes gave out and caused him to stumble.  (Tr. 169.)  Plaintiff stated that climbing stairs and kneeling were both difficult for him, and that he could not lift much "because of leg weakness."  (Tr. 169-70.)

Regarding his Asperger's Syndrome, Plaintiff reported that his condition has led to ongoing conflicts with co-workers and that he lost jobs because of problems getting along with people.  (Tr. 165, 171.)  He stated that his condition caused him to have ongoing conflict with friends and caused him to limit social activities, which he finds stressful.  (Tr. 169.)  He also is unable able to adjust to change and sometimes has a "meltdown" or "overrespond[s] emotionally."  (Tr. 172.)

Plaintiff also stated that he watched television, read, listened to music, managed his financial investments, and took care of his two cats.  (Tr. 165-68, 172.)  He also indicated that he took care of his own personal needs, prepared meals daily, and was able to handle his finances.  (Tr. 165-68.)  He also went out alone daily and drove.  (Tr. 167-68.)  He socialized, meeting with friends for a few hours several times per week.  (Tr. 169.)

At the May 5, 2016 hearing, Plaintiff testified that at his last job as a quality consultant, he worked with customers, ensured that the company's product met standards, worked with suppliers, and interfaced with different departments in his company.  (Tr. 20-21.)  He also testified that he had problems with coworkers at every job he has had in the past fifteen years.  (Tr. 24-25.) Specifically, he stated that his condition causes him to be unaware of how his actions are perceived by others, and that he had "outbursts" and exhibited "completely unprofessional behavior."  (Tr. 25-29.)  Additionally, he stated that he began suffering from an undiagnosed illness in October 2013, causing him problems with standing, balancing, and walking.  (Tr. 29.)  He stated that he has constant pain in his lower right leg and foot, and his foot has a nearly constant "burning numbness" which causes instability while standing.  (Tr. 29-30.)  Wearing shoes made the pain worse.  (Tr. 30.)  Plaintiff also testified that he considered himself to be a recluse and lived alone. (Tr. 31.) During the day, he watched television and used the internet.  (Id.)  He also went to the supermarket in the morning to avoid people.  (Id.)

**C. Medical Evidence**

**1. Dr. Brianna Atkins – Bay Shore Urgent Care**

On August 9, 2013, Dr. Brianna Atkins of Bay Shore Urgent Care examined Plaintiff.  (Tr. 301.)  Dr. Atkins noted that he was generally healthy with no change in strength or exercise tolerance and that the examination was unremarkable.  (Id.)  She diagnosed Plaintiff with hyperlipidemia and impotence of an organic origin.  (Id.)

**2. Dr. Marc Cimmino – Bay Shore Urgent Care**

On January 29, 2014, Dr. Marc Cimmino, also of Bay Shore Urgent Care, examined Plaintiff.  (Tr. 299.)  Plaintiff stated that he had been having trouble walking and weak leg muscles for the past two months.  (Id.)  On the same day, Dr. Cimmino completed a form certifying that

Plaintiff was entitled to a disabled parking permit.  (Tr. 334.)  Dr. Cimmino opined that Plaintiff had difficulty walking and "cannot walk long distances without falling or getting extremely tired." (Id.)  Additionally, he noted that Plaintiff had a neuromuscular dysfunction that severely limits mobility and was unable to walk 200 feet without stopping.  (Id.)  He also stated that Plaintiff's disability was temporary, and he expected him to recover by July 1, 2014.  (Id.)  Dr. Cimmino did not opine as to any lifting or carrying restrictions.

On February 17, 2014, Plaintiff underwent an MRI of the lumbar spine at Zwanger-Pesiri Radiology that Dr. Cimmino ordered.  (Tr. 303.)  The results indicated that Plaintiff had "degenerative disc disease and facet arthrosis resulting in moderate foraminal stenosis at multiple levels."  (Id.)  While there was an "abutment of the exiting nerve roots," there was no nerve compression, severe thecal sac compression, or fracture or aggressive lesion within the lumbar spine.  (Tr. 303-04.)  On February 28, 2014, Plaintiff underwent bloodwork that Dr. Cimmino ordered.  (Tr. 298, 305-08.)  The test results were remarkable for high cholesterol levels.  (Tr. 305.)

### 3.  Katherine Cody, Psy.D. – Consultative Examiner

On February 5, 2014, Dr. Katherine Cody, a psychologist, examined Plaintiff.  (Tr. 332.) She diagnosed him with Asperger's Disorder and noted that he has problems related to his primary support group, social environment, and occupational.  (Id.)  Specifically, the evaluation indicated significant concerns with his executive functioning abilities.  (Id.)  Dr. Cody gave Plaintiff a Global Assessment Functioning ("GAF") score of 60 and recommended psychotherapy to improve his understanding of Asperger's Disorder, to learn mindfulness strategies targeting his executive functioning abilities, and coping strategies targeting his anxiety.  (Id.)  She also suggested Plaintiff engage in a support group for others with Asperger's Disorder.  (Tr. 333.)

### 4.  Kathleen Acer, Ph.D. – Consultative Examiner

On June 24, 2014, Dr. Kathleen Acer performed a psychiatric evaluation of Plaintiff.  (Tr. 322.)  Plaintiff reported to Dr. Acer that he had recently been diagnosed with autistic spectrum disorder and that he was not receiving treatment for it.  (Id.)  Dr. Acer noted that Plaintiff was cooperative but presented in a socially uncomfortable and awkward manner.  (Tr. 323.)  He was dressed in an appropriate, well-groomed manner.  (Id.)  His eye contact was poorly focused, his speech was stilted and formal, and poor pragmatics of communication were noted.  (Id.)  Dr. Acer noted that Plaintiff was coherent and goal directed.  (Id.)  He was able to adequately concentrate and perform simple calculations.  (Id.)  His memory was intact, and his cognitive functioning was adequate.  (Tr. 322.)  Further, Plaintiff reported that can dress, bathe, and groom himself, as well as perform daily tasks such as driving, shopping, and handling his financial affairs.  He also reported that he goes to the gym.  (Tr. 324.)

Dr. Acer opined that Plaintiff was able to follow and understand directions and instructions, appropriately perform tasks, maintain attention and concentration, maintain a regular schedule, and learn or perform complex tasks independently. (Tr. 323.)  She noted that Plaintiff may have difficulty adequately relating with others and dealing with stress.  (Id.)  Dr. Acer stated that the results of the evaluation appeared to be consistent with some psychiatric issues but that Plaintiff's psychiatric issues did not in and of themselves appear severe enough to interfere with his functioning.  (Id.)  Dr. Acer diagnosed autism spectrum disorder and neuromuscular disorder, unspecified.  (Tr. 324.)

### 5.  Dr. Andrea Pollack – Consultative Examiner

On June 24, 2014, Dr. Andrea Pollack, D.O., performed a neurological examination of Plaintiff.  (Tr. 327.)  She noted that Plaintiff reported self-diagnosed neuropathy despite a negative

MRI and the fact that he had not yet undergone an EMG or been examined by a neurologist.  (Id.)
He reported that he had a constant burning pain in his legs with tingling and numbness.  (Id.)
Plaintiff stated that he cooked daily, cleaned, did laundry, and shopped twice per week.  (Id.)  He
showered and dressed daily, watched television, listened to the radio, read, and socialized with
friends.  (Id.)  When examining Plaintiff's gait, Dr. Pollack opined that he was unsteady while
walking and could not walk on heels and toes secondary to imbalance.  (Tr. 328.)  Plaintiff did not
walk with an assistive device and did not have trouble rising from a chair.  (Id.)  He needed no
help changing for the exam or getting on and off the exam table.  (Id.)  Regarding his lower
extremities, Dr. Pollack noted Plaintiff had normal muscle tone, his strength was 5/5 in proximal
and distal muscles and showed no signs of dysmetria, tremors, or muscle atrophy.  (Id.)  Regarding
his upper extremities, his muscle tone was normal, he had no muscle atrophy, and his strength was
5/5 in proximal and distal muscles.  (Id.)  She noted that his hand and finger dexterity were intact,
and his grip strength was 5/5.  (Id.)  Dr. Pollack also stated that Plaintiff dressed appropriately,
maintained appropriate eye contact, and had no suggestion of impairment in insight or judgment.
(Id.)

Dr. Pollack diagnosed Plaintiff with lower extremity paresthesia and pain, Asperger's
disease, and decreased visual acuity in his left eye.  (Tr. 329.)  Dr. Pollack also opined that Plaintiff
was restricted in activities which require visual acuity of the left eye, had evidence of mild memory
impairment, had a mild restriction in walking and standing, and a moderate restriction in climbing.
She noted that Plaintiff should avoid heights, operating heavy machinery, heavy exertion, and
activities that put him at risk for a fall.  (Id.)

### 6.  Dr. Shapiro – State Agency Psychological Consultant

On June 27, 2014, Dr. Shapiro, a state agency psychological consultant, examined Plaintiff's medical record up to that date, but did not physically meet with him.  (Tr. 42-43.)  Dr. Shapiro concluded that Plaintiff suffered from an autistic disorder and found that Plaintiff suffered from moderate difficulty in maintaining social functioning but had no restrictions in activities of daily living, or in maintaining concentration, persistence, or pace.  (Id.)

### 7.  Dr. Lewis Cylus – State Agency Medical Consultant

On July 10, 2014, Dr. Cylus, a state agency medical consultant, examined the medical record.  (Tr. 44-46.)  Dr. Cylus noted that Plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently.  (Tr. 44.)  In addition, Dr. Cylus opined that Plaintiff could stand or walk for six hours and sit for six hours in an eight-hour workday.  (Id.)  Further, Dr. Cylus specified that Plaintiff could occasionally climb ramps, stairs, and ladders, could balance frequently, and kneel or crouch occasionally.  (Id.)  Finally, Dr. Cylus stated that Plaintiff should avoid concentrated exposure to machinery and heights.  (Id.)  Dr. Cylus noted that the prior reports of an unsteady gait were inconsistent with the imaging of the lumbar spine.  In particular, he stated "he would have to take the CE doctor at her word that there is some unsteadiness of gait, but this cannot be explained by the findings or the lumbar imaging."  (Id.)

### 8.  Physician's Assistant ("PA") Stella Venegas

On July 31, 2014, PA Stella Venegas completed a form for Plaintiff to receive a disabled parking permit.  (Tr. 335.)  She stated that Plaintiff "cannot walk long distances without falling or getting extremely tired" and that he had a neuromuscular dysfunction that severely limited mobility.  (Id.).  She stated that Plaintiff's disability was temporary, and that she expected he would recover by January 1, 2015.  (Id.)

**9.  Dr. Ronald Dunphy – Neurological Testing**

On May 12, 2015, Plaintiff underwent nerve conduction and electromyography (EMG) testing of both legs, at Long Island Neurology, P.C. at the request of Ronald Dunphy, D.O.  The results of the study were normal.  (Tr. 346-48.)

**10. Dr. Ronald Brenner – Psychiatrist**

Plaintiff began seeing Dr. Ronald Brenner, a psychiatrist at Neurobehavioral Research Inc., in January 2015.  (Tr. 352.)  On January 28, 2015, Dr. Brenner diagnosed Plaintiff with generalized anxiety order and prescribed him Klonopin.  (Id.)  At a follow-up appointment, on February 10, 2015, Dr. Brenner found that Plaintiff was responding well to treatment and had no side effects. He again prescribed Klonopin, but lowered the dose.  (Id.)  On March 9, 2015, Dr. Brenner found no changes to Plaintiff's mental status.  (Id.)  On May 18, 2015, Dr. Brenner found Plaintiff's mental status had improved and stated that he was in "excellent condition."  (Id.)  On November 9, 2015, Dr. Brenner stated that Plaintiff was responding well to treatment.  (Id.)  On January 11, 2016, Dr. Brenner stated that Plaintiff was responding well to treatment and prescribed Gabapentin[2].  (Id.)

**11. Dr. Rajeev Motiwala – Neurologist**

Following the ALJ's decision, on November 8, 2016, Dr. Rajeev Motiwala performed an EMG on plaintiff at Mount Sinai Medical Center[3].  (Tr. 7.)  He found that electrodiagnostic test results demonstrated mild chorionic axonal sensorimotor polyneuropathy that may have arisen

---

[2]  Plaintiff argues that Gabapentin was prescribed to treat neuropathic pain.  (Pl. Mem. at 17.)  Dr. Brenner's reasons for prescribing the medication are not clear from the record.  (Tr. 352.)   Gabapentin "is used with other medications to prevent and control seizures. It is also used to relieve nerve pain following shingles [] in adults. Gabapentin is known as an anticonvulsant or antiepileptic drug."  WebMD, Gabapentin, https://www.webmd.com/drugs/2/drug-14208-8217/gabapentin-oral/gabapentin-oral/details (last visited Nov. 17, 2020).

[3]  This examination was conducted after the ALJ's decision on July 27, 2016 and was therefore not submitted to the ALJ.

from previous acute inflammatory demyelinating polyneuropathy.  (Id.)  In addition, he noted that these findings could not rule out small fiber neuropathy.  (Id.)  Dr. Motiwala did not opine as to any limitations of Plaintiff.

## D.  The ALJ's Decision

The ALJ issued his decision on July 27, 2016, applying the five-step process described below, pursuant to 20 C.F.R. § 404.1520.  (Tr. 52-64.) At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 15, 2013. (Tr. 57.)   At step two, the ALJ found that Plaintiff suffered from Asperger's Disorder and degenerative disc disease of the lumbar spine.  (Id.)  At step three, ALJ Kilgannon determined that Plaintiff's impairments, alone or in combination do not meet or medically equal the severity of any of the regulation's listed impairments.  (Tr. 57-58.)  Specifically, ALJ Kilgannon considered Listings 1.04, 12.00, and 12.10.  (Id.)

ALJ Kilgannon then addressed step four, first considering Plaintiff's RFC.  An RFC determination identifies what work a claimant can still perform, despite his limitations.  See C.F.R. § 404.1545.  The ALJ determined that Plaintiff had the RFC to perform medium work, except that Plaintiff could only occasionally climb ladders, ropes, and scaffolds and could frequently use ramps or stairs.  (Tr. 58.)  The ALJ also found that Plaintiff can frequently balance, stoop, kneel crouch and crawl.  (Id.)  Additionally, Plaintiff needs to avoid concentrated exposure to excessive noise, is limited to low stress work, which is defined as work requiring only occasional decision making and occasional changes in the work setting, and is also limited to only occasional interaction with the public and coworkers.  (Id.)

In considering Plaintiff's limitations, ALJ Kilgannon made various observations about Plaintiff's testimony and reviewed Plaintiff's medical records.  (Tr. 58-63.)  The ALJ found that

Dr. Cylus and Dr. Shapiro never personally examined Plaintiff and did not have the opportunity to review the medical evidence submitted after they rendered their opinions. As such, the ALJ afforded their opinions little weight. (Tr. 62.) The ALJ afforded Dr. Cody's GAF score little weight because it "only represent[s] 'snapshots' of an individual's functionality at a particular point in time but [is] not necessarily representative of the individual's functionality over a prolonged period of time." (Id.) The ALJ found that the record did not reflect that PA Vanegas had ever personally examined Plaintiff, her opinion was not supported by the objective medical evidence, and her opinion was limited to a six-month time period. Therefore, the ALJ afforded her opinion "some weight, but not significant weight." (Id.) The ALJ found that although Dr. Cimmino examined Plaintiff on several occasions, his opinions were not supported by the objective medical evidence, including the examination findings from his medical facility. Additionally, his opinion was limited to a six-month time period. (Id.) Accordingly, his opinion was given "some weight, but not significant weight." (Id.) The ALJ found Dr. Pollack and Dr. Acer both personally examined Plaintiff and their opinions were supported by objective medical evidence. Accordingly, he afforded their opinions significant weight. (Id.) The ALJ also noted that despite Plaintiff's complaints of problems with his lower extremities, the results of his physical examinations have consistently been unremarkable, and the results of a study of Plaintiff's lower extremities were normal. (Tr. 62-63.)

The ALJ also considered Plaintiff's statements and testimony regarding his activities including that Plaintiff: cooks on a daily basis, cleans, does laundry, shops twice a week, manages his own finances, cares for his own personal needs, drives, socializes, goes to the gym, cares for his cat, invests in stocks, and can follow written and spoken instructions. (Id.)

Based on his RFC determination, the ALJ concluded at step four that Plaintiff could not perform his past relevant work as a quality consultant or quality assurance manager.  (Tr. 63.)

Finally, ALJ Kilgannon relied on the testimony of the Vocational Expert ("VE") to determine at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform including as an industrial cleaner (100,000 jobs in the national economy), a hand packager (90,000 jobs in the national economy), and a warehouse worker (70,000 jobs in the national economy).  (Tr. 64.)  Accordingly, the ALJ found that Plaintiff was not under a disability as defined in the Social Security Act from August 15, 2013 through the date of his decision.  (Id.)

## II. DISCUSSION

**A.  Social Security Disability Standard**

Under the Social Security Act, "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations set out a five-step sequential analysis by which an ALJ determines disability.  20 C.F.R. § 404.1520.  The analysis is summarized as follows:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the

Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (second alteration in original) (quoting Green–Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)).   As part of the fourth step, the Commissioner determines the claimant's RFC before deciding if the claimant can continue in his or her prior type of work.  20 C.F.R. § 404.1520(a)(4)(iv).  The claimant bears the burden at the first four steps; but at step five, the Commissioner must demonstrate "there is work in the national economy that the claimant can do."  Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009); see also Campbell v. Astrue, No. 12-CV-5051, 2015 WL 1650942, at *7 (E.D.N.Y. Apr. 13, 2015) (citing Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999).

## B.  **Scope of Review**

In reviewing a denial of disability benefits by the SSA, it is not the function of the district court to review the record de novo, but instead to determine whether the ALJ's conclusions "'are supported by substantial evidence in the record as a whole, or are based on an erroneous legal standard.'"  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (quoting Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)).  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'"  Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  Thus, the Court will not look at the record in "isolation but rather will view it in light of other evidence that detracts from it."  State of New York ex rel. Bodnar v. Sec. of Health and Human Servs., 903 F.2d 122,

126 (2d Cir. 1990).   An ALJ's decision is sufficient if it is supported by "adequate findings . . . having rational probative force."  Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

## C. Analysis

Plaintiff puts forth two arguments in support of his appeal of ALJ Kilgannon's decision. First, Plaintiff argues that the ALJ's finding that Plaintiff could perform an RFC of medium work is not supported by any of the medical experts' opinions, and that the ALJ substituted his lay opinion for that of the objective medical evidence.  (Pl. Mem. at 10-20.)  Second, Plaintiff argues that the ALJ failed to adequately consider his strong work history in making a credibility analysis. (Id. at 21.)  For the reasons set forth below, neither of these arguments is availing.

### 1.  The ALJ's RFC Analysis is Based on Substantial Evidence

Plaintiff argues that ALJ Kilgannon erred in finding that Plaintiff's RFC allowed him to perform "medium work."  (Pl. Mem. 14-20.)  Specifically, Plaintiff contends that every medical experts' opinion in this case indicated that Plaintiff could at most perform "light work" and the ALJ used his lay opinion in finding that Plaintiff could perform "medium work."  (Id. at 10-13.) Plaintiff only challenges the portion of the RFC regarding his physical impairments, and argues that because the standing/walking requirements for medium and light work are the same, "this case literally boils down to whether the ALJ's finding that Plaintiff can lift and/or carry up to 50 pounds for up to one-third of the workday and 25 pounds for up to two-thirds . . . is supported by substantial evidence."  (Id. at 12.)

#### a.  RFC Analysis

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations."  Barry v. Colvin, 606 F. App'x 621, 622 n.1 (2d Cir. 2015) (summary order); see Crocco v. Berryhill, No. 15-CV-6308, 2017 WL 1097082, at *15 (E.D.N.Y. Mar. 23, 2017)

(stating that an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis) (citing 20 C.F.R. § 404.1545(b)).

In determining a claimant's RFC, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." Crocco, 2017 WL 1097082, at *15; see also Barry, 606 F. App'x at 622 n.1 ("In assessing a claimant's RFC, an ALJ must consider 'all of the relevant medical and other evidence,' including a claimant's subjective complaints of pain.") (quoting 20 C.F.R. § 416.945(a)(3)). An RFC determination must be affirmed on appeal where it is supported by substantial evidence in the record. Barry, 606 F. App'x at 622 n.1.

The ALJ's decision regarding the weight to be accorded to each medical opinion in the record and how to reconcile conflicting medical opinions is governed by the treating physician rule. 20 C.F.R. § 404.1527(c). According to the treating physician rule, if a treating physician's opinion regarding the nature and severity of an individual's impairments is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ will credit that opinion with "controlling weight." 20 C.F.R. § 404.1527(c)(2); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). However, an ALJ may discount a treating physician's opinion when the opinion is conclusory, the physician fails to provide objective medical evidence to support his or her opinion, the opinion is inconsistent with the record, or the evidence otherwise supports a contrary finding. See 20 C.F.R. § 404.1527(c). The ALJ is required to give "good reasons" in support of his determination on the weight given to a treating physician's opinion. See Schaal, 134 F.3d at 503–04.

Where genuine conflicting evidence exists, the ALJ may exercise discretion in resolving the conflict. <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002); <u>Schaal</u>, 134 F.3d at 504. Further, an ALJ may consider and "choose between properly submitted medical opinions." <u>Balsamo v. Chater</u>, 142 F.3d 75, 81 (2d Cir. 1998). The ALJ may not, however, substitute his own lay opinion for those submitted by medical professionals. <u>See, e.g.</u>, <u>Selian v. Astrue</u>, 708 F.3d 409, 419 (2d Cir. 2013). After considering all the evidence in the record, the ALJ is entitled to make a decision consistent with the record as a whole. <u>See</u> <u>Matta v. Astrue</u>, 508 F. App'x 53, 56 (2d Cir. 2013).

An RFC of "light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and "requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." 20 C.F.R. 404.1567(c); SSR 83-10. An RFC of "medium work" additionally involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." <u>Id.</u>

### b. ALJ Kilgannon Properly Weighed the Objective Medical Evidence

Plaintiff argues that the ALJ failed to accurately assign weight to the medical opinions of Dr. Cylus, Dr. Cimmino, and PA Venegas relating to his physical impairments. (Pl's Mem. 10-20.) Plaintiff contends that the ALJ improperly assigned Dr. Cylus's opinion "little weight," and Dr. Cimmino and PA Vanegas's opinions "some weight, but not significant weight." (<u>Id.</u>)

First, the ALJ reasonably assigned "little weight" to Dr. Cylus's opinion that Plaintiff was limited to performing the equivalent of light work. (Tr. 62-63.) The ALJ provided "good reasons" to discount the opinion of the state agency medical consultant: Dr. Cylus never personally examined Plaintiff and did not review the medical evidence that was submitted after his medical opinion was rendered in July 2014, including the unremarkable EMG of Plaintiff's legs performed in May 2015. (Tr. 62.) <u>See</u> <u>Hilsdorf v. Comm'r of Soc. Sec.</u>, 724 F. Supp. 2d 330, 348 (E.D.N.Y.

16

2010) ("Medical reports that are not based on personal observation 'deserve little weight in the overall evaluation of disability'").  Additionally, although not explicitly stressed by the ALJ, the persuasive force of Dr. Cylus's opinion was obviously tempered by his own observation that Plaintiff was a "difficult assessment" and his statement that although he would take Dr. Pollack's report of unsteady gait at her word, these observations "cannot be explained by the physical findings or the lumbar imaging."  (Tr. 46.)

Second, the ALJ assigned "some weight, but not significant weight" to the opinion of Dr. Cimmino, from Bay Shore Urgent Care, that Plaintiff could not walk more than 200 feet without getting extremely tired or needing to stop and that he expected him to recover by July 2014[4].  (Tr. 62.)  The ALJ explained that although Dr. Cimmino had examined Plaintiff on several occasions[5], his opinion was not supported by the objective medical evidence, including the examination findings from his own medical facility, namely the unremarkable MRI that Dr. Cimmino himself ordered.  (Id.)  Additionally, the ALJ noted that Dr. Cimmino's opinion applied only to a period of less than six months.  (Id.)

Third, the ALJ assigned PA Vanegas's opinion that Plaintiff could not walk more than 200 feet without getting tired or needing to stop "some weight but not significant weight."  (Tr. 62.)  The ALJ provided "good reasons" for the weight, noting that the record does not indicate that PA Vanegas ever personally examined Plaintiff, her opinion only applied to a time period of less than

---

[4]  Plaintiff argues that "the reality is that the ALJ plainly gave no weight to [Dr. Cimmino's] opinion."  (Pl. Mem. at 18.)  The ALJ properly assigned "some weight, but not significant weight" to the opinion and provided "good reasons" for doing so.  The Court finds no basis in the record to conclude that, in determining Plaintiff's RFC, the ALJ actually gave no weight to Dr. Cimmino's opinion.

[5]  Based on the record, Dr. Cimmino examined Plaintiff on January 29, 2014 and on the same day, completed a form certifying that Plaintiff was entitled to a disabled parking permit.  (Tr. 299, 334.)  Dr. Cimmino also ordered an MRI and bloodwork, which were performed on February 17, 2014 and February 28, 2014, respectively.  (Tr. 298, 303-05.)

six months, and the opinion was contradicted by the objective medical evidence.  (Tr. 62.)
Furthermore, physicians' assistants are not considered an acceptable medical source to whom the
treating physician rule applies.  See Genier v. Astrue, 298 F. App'x 105, 108-09 (2d Cir. 2008).
Rather, "physicians' assistants are defined as 'other sources' whose opinions may be considered
with respect to the severity of the claimant's impairment and ability to work, but need not be
assigned controlling weight."  Genier, 298 F. App'x at 108 (citing 20 C.F.R. § 416.913(d)(1)).

Accordingly, the ALJ properly weighed the medical evidence.

### c.  Substantial Evidence Supports the RFC and ALJ Kilgannon Did Not Substitute His Lay Opinion

In determining the RFC, the ALJ relied on Dr. Pollack's examination, the results of
physical examinations, which "consistently have been unremarkable in regard to [Plaintiff's] legs,"
the results of an electrodiagnostic study which showed that Plaintiff's lower extremities were
normal, and Plaintiff's own statements and testimony regarding his daily activities.  (Tr. 62-63.)
However, Plaintiff argues that there is not substantial evidence in the record to support the RFC of
medium work.  (Pl. Mem. at 12, 15.)  Plaintiff only challenges the portion of the RFC regarding
his physical impairments, not the portion related to his mental impairments.  (Id. at 12.)
Specifically, Plaintiff contends that Dr. Pollack's opinion does not provide substantial evidence to
support the RFC of medium work because Dr. Pollack did not explicitly opine on Plaintiff's
lifting/carrying restrictions and Dr. Cylus, who reviewed Dr. Pollack's findings in his examination
of the medical record, found that Plaintiff could perform the equivalent of light work.  (Id. at 15-
20.)

In her findings, Dr. Pollack noted that Plaintiff lived alone, used no assistive device, needed
no help changing for the exam or getting on and off the exam table, was able to rise from a chair
without difficulty, his hand and finger dexterity were intact, his grip strength was full (5/5)

bilaterally, his strength in upper and lower extremities was also full with no muscle atrophy and normal muscle tone, and he had normal sensation to pain, light touch, proprioception and vibration. (Tr. 327-328.)  She opined that Plaintiff had only mild restrictions in walking and standing and moderate restrictions in climbing, and that he should avoid heights, operating heavy machinery and activities requiring heavy exertion and that might put him at risk for a fall.  (Tr. 329.)  The ALJ assigned significant weight to Dr. Pollack's opinion because she personally examined Plaintiff and her opinion was well-supported by the objective medical evidence.  (Tr. 62.)  See Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011) (medical opinions of consultative examining physicians can constitute substantial evidence).

Despite Plaintiff's contentions otherwise, Dr. Pollack's conclusions support the ALJ's finding that Plaintiff could perform medium work.  See Heitz v. Comm'r of Soc. Sec., 201 F. Supp. 3d 413 (S.D.N.Y. 2016) (ALJ's finding that claimant retained the RFC for medium work was supported by consultative examiner's findings that claimant had full range of motion of hips, ankles, wrists, shoulders, elbows and forearms bilaterally, as well as full flexion, extension and lateral flexion bilaterally in cervical and lumbar spine, had no apparent muscle atrophy and had grip strength of 4+/5 in one hand 5/5 in the other, along with testimony that claimant was able to construct jigsaw puzzles and complete activities of daily living without assistance); Vanderhorst v. Berryhill, No. 17-CV-10205, 2019 WL 3416003, at *16 (S.D.N.Y. June 25, 2019) (report and recommendation), adopted sub nom. Vanderhorst v. Saul, No. 17-CV-10205, 2019 WL 3409795 (S.D.N.Y. July 29, 2019) (ALJ's finding that claimant retained the RFC for medium work was supported by consultative examiner's findings that claimant had full range of motion in her shoulders, elbows, forearms, and wrists; stable, non-tender joints, with no redness, heat, swelling or effusion; a lack of any cyanosis, clubbing, edema, or atrophy in her extremities; and strength of

5/5 in both her upper and lower extremities, as well as bilaterally in her grip); Motyka v. Colvin, No. 15-CV-54S, 2016 WL 6067846, at *5 (W.D.N.Y. Oct. 17, 2016) (physicians' findings that Plaintiff "ha[d] only mild limitations walking or standing" supported ALJ's assessment that Plaintiff could perform medium work); Henriquez v. Colvin, No. 15-CV-2655(JS), 2016 WL 4384720, at *9 (E.D.N.Y. Aug. 15, 2016) ("Courts in this Circuit and elsewhere have concluded that a claimant can perform light or medium work based on 'an opinion assessing moderate limitations for sitting, standing and walking.'") (citing Harrington v. Colvin, No. 14-CV-6044, 2015 WL 790756, at *14 (W.D.N.Y. Feb. 25, 2015)).

It was reasonable for the ALJ to infer, from the absence of any lifting restrictions in Dr. Pollack's opinion that she concluded that Plaintiff had no such restrictions other than avoiding lifting and carrying that constituted "heavy exertion." See Cillari v. Colvin, No. 13-CV-4154, 2015 WL 1433371, at *22 n.46 (S.D.N.Y. Mar. 30, 2015) (finding that although consulting physician's report did not explicitly state that Plaintiff had no limitation in sitting, the ALJ "reasonably implie[d] that [he] opined that Plaintiff had no limitation with respect to sitting," when the report was read as a whole); Heitz, 201 F. Supp. 3d at 425 (finding that "although [the consultative examiner] did not make specific conclusions regarding the extent of Heitz's lifting or carrying limitations, his examination and findings as a whole imply that only minimal such limitations exist."); Scholtisek v. Colvin, 110 F. Supp. 3d 464, 476 (W.D.N.Y. 2015) (doctor's finding of "moderate limitation on heavy ambulation or exertional activity in the standing position or repetitive bending/twisting of the lumbar spine" was consistent with ALJ's RFC assessment that Plaintiff could perform medium work). It was more than reasonable for the ALJ—after considering Dr. Pollack's conclusion that Plaintiff had only a mild restriction in standing/walking and had to avoid "heavy exertion," along with the other evidence in the record—to conclude that

20

Plaintiff could meet the lifting and carrying requirements of medium work.  The ALJ did not improperly rely on his lay opinion to conclude that Plaintiff could lift no more than 50 pounds at a time and frequently lift or carry objects weighing up to 25 pounds,  and walk and/or stand for up to six hours in an eight-hour workday.

Furthermore, Dr. Cylus's opinion that Plaintiff could lift/carry 10 pounds frequently and 20 pounds occasionally, does not dictate a finding that Dr. Pollack's examination fails to support an RFC for medium work.  As explained above, the ALJ provided "good reasons" for assigning little weight to Dr. Cylus's opinion.  No other medical professional opined as to the amount of weight Plaintiff could lift or carry.  Contrary to Plaintiff's argument, the ALJ was not required to accept Dr. Cylus's interpretation of Dr. Pollack's use of the terms "mild" and "heavy exertion," particularly when Dr. Cylus's conclusions were themselves so tepid.

In addition to Dr. Pollack's examination, the RFC is also supported by the objective medical evidence in the record.  In February 2014, Dr. Cimmino ordered an MRI of Plaintiff's lumbar spine, which found only moderate foraminal stenosis with no abutment of exiting nerve roots, no nerve root compression, no severe thecal sac compression, and no fracture or aggressive lesion within the lumbar spine. (Tr. 60, 303-04.)  In May 2015, an EMG test of Plaintiff's lower extremities did not reveal any evidence of neuropathy and was unremarkable.  (Tr. 62, 346.) Additionally, although Plaintiff argues that his difficulty walking is due to neuropathy or a "muscular dysfunction," he acknowledged to Dr. Pollack and at the hearing that he had not received a diagnosis for this condition.  (Tr. 29, 327.)  Finally, the ALJ relied on Plaintiff's own statements that he cooks on a daily basis, cleans, does laundry, shops twice a week, cares for his own personal needs, goes to the gym, and cares for his two cats.  (Tr. 62.)

Therefore, the RFC assessment is supported by substantial evidence in the record and the ALJ did not rely on his own "lay opinion" in making the RFC determination.  Johnson v. Colvin, 669 F. App'x 44, 46–47 (summary order) (2d Cir. 2016) ("[B]ecause the record contained sufficient other evidence supporting the ALJ's determination and because the ALJ weighed all of that evidence when making his residual functional capacity finding, there was no 'gap' in the record and the ALJ did not rely on his own 'lay opinion.'").  Accordingly, when Dr. Pollack's opinion is coupled with all of the other evidence in the record, there is certainly sufficient evidence to support the ALJ's RFC finding.

### d.  Duty to Develop the Record

Plaintiff argues that the ALJ should have "enlisted a review of the record and testimony by a medical expert; recontacted Dr. Poll[a]ck for an explanation of her opinion and clarification regarding the specifics of Plaintiff's functional limitations; recontacted Drs. Cylus and/or Cimmino for further information; or . . . returned the complete case record to Dr. Cylus . . . for review."  (Pl's Mem. at 20.)  These arguments do not have merit.

The decision of whether to obtain the opinion of a medical expert is discretionary.  See 20 C.F.R. § 404.1513a(b)(2) ("Administrative law judges may also ask for medical evidence from expert medical sources.") (emphasis added).  Furthermore, the ALJ has no obligation to recontact a consultative examiner, state agency medical consultant, or treating physicians.  The regulations state only that where the adjudicator believes the evidence is inadequate to make a disability determination, the decision of whether to recontact a treating source is discretionary.  See 20 C.F.R. § 404.1520b(b).  The record does not indicate that the evidence is inadequate to make an RFC determination, and even if the evidence was inadequate, it was in the ALJ's discretion whether to recontact a treating physician.  See id.

An ALJ has an affirmative duty to develop the record where there are deficiencies and "clear gaps in the administrative record."  Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). However, "the flip-side of this same proposition" is that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Petrie, 412 F. App'x at 406 (quoting Rosa, 168 F.3d at 79 n.5).  The ALJ's duty to develop the record exists even when a claimant is represented by counsel.  Rosa, 168 F.3d at 79.  Here, the ALJ did not fail to develop the record, which contained medical opinions, treatment notes, and analyses of Plaintiff's MRI and EMG from multiple medical professionals regarding Plaintiff's physical impairments.  Under these circumstances, the ALJ was not required to recontact any of the medical professionals for further information or enlist review of the record by another medical expert.

### 2.  **The ALJ Properly Assessed Plaintiff's Credibility**

Finally, Plaintiff argues that the ALJ's credibility finding is broadly "generally flawed," and specifically flawed because he failed to "even acknowledge Plaintiff's strong work history." (Pl. Mem. at 21.)

The ALJ followed the two-step inquiry outlined in the regulations and determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 59.)

The ALJ has the discretion to evaluate and ultimately not credit a plaintiff's testimony about the severity of his pain and functional limitations.  See Burnette v. Colvin, 564 F. App'x 20, 605, 609 (2d Cir. 2008) (summary order).  And work history is one of multiple factors an ALJ may consider in determining credibility.  See Schaal, 134 F.3d at 502 (finding that work history may

enhance credibility but is not dispositive in a credibility determination).  A failure to explicitly mention work history in a credibility determination does not undermine an otherwise valid credibility determination based on other factors.  See Wavercak v. Astrue, 420 F.App'x 91, 94 (2d Cir. 2011).

Here, the ALJ reasonably weighed the applicable evidence—reviewing the medical records and specifically considering Plaintiff's testimony and statements contained in the record. Although the ALJ did not explicitly state that he considered work history in making a credibility determination, the ALJ elicited testimony from Plaintiff regarding his work history at the hearing, and in his decision, noted Plaintiff's past work experience in finding that Plaintiff was not able to return to his past work as a quality consultant or quality assurance manager.  (Tr. 20-24; 25-29; 63.)

Accordingly, the ALJ properly evaluated Plaintiff's subjective complaints in determining that Plaintiff retained the ability to perform medium work.

## III. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for judgment on the pleading and GRANTS the Commissioner's motion for judgment on the pleadings.  The Clerk of the court is directed to enter judgment in favor of the Commissioner and close the case.


**SO ORDERED.**

Dated: November 23, 2020
Central Islip, New York

                                     _____/s/ (JMA)_____
                                     JOAN M. AZRACK
                                     UNITED STATES DISTRICT JUDGE